UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA

              08 Cr. 576 (RPP)

   - against -           **OPINION AND ORDER**

ANTHONY WHITE,

      Defendant.
-----------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

   Defendant Anthony White, charged in a one-count indictment with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1), moves to suppress evidence, specifically a loaded handgun, he asserts was obtained as the result of an illegal search and seizure conducted on May 1, 2008. For the reasons set forth below, Defendant's motion is denied.

**I. FACTS[1]**

   On March 7, 2007, Defendant was released by the New York Department of Correctional Services to the custody of the New York Division of Parole and became subject to its conditions of parole. (Gov't Ex. 1.) Specifically, Defendant signed "Conditions of Release" which state, in part:

> I will permit my Parole Officer to visit me at my residence and/or place of employment and I will permit the search and inspection of my person, residence and property. I will discuss any proposed changes in my residence, employment or program status with my Parole Officer. I understand that I have an immediate and continuing duty to notify my Parole Officer of any changes in my residence,

---

[1] These findings of fact are based on an evidentiary hearing held before this Court on September 26, 2008. At the hearing, Parole Office Eugene Deal, Detective David Wenzel, and Michelle Daise testified.

1

> employment or program status when circumstances beyond my control make prior discussion impossible.

(Id.)  In addition, Defendant agreed to "fully comply with the instructions of Parole Officer and obey such special additional written conditions as he, a Member of the Board of Parole or an authorized representative of the Division of Parole, may impose."  (Id.) On March 28, 2007, the Division of Parole imposed Special Conditions of Release to Parole Supervision ("Special Conditions") on Defendant, which stated that Defendant "will be restricted from St. Nicholas Projects Complex, New York City."  (Gov't Ex. 2.) The Special Conditions contain the following certification signed by Defendant: "I hereby certify that I have read and understand the above Special Conditions of my release and that I have received a copy of these Special Conditions."  (Id.)

### A. The May 1, 2008 Search

#### i. Testimony of Parole Officer Deal

New York State Parole Officer Eugene Deal testified that he has been a parole officer for almost eighteen years; his duties and responsibilities as a parole officer are: "To reintegrate parolees back into society by using social service programs, nonprofit organizations, policing their activities, helping them try to be successful citizens in society."  (September 26, 2008 Hearing Transcript ("Tr.") at 15-16.)

In the afternoon of May 1, 2008, Parole Officer Deal and several members of the New York Police Department ("NYPD") conducted a special operation to execute an arrest warrant for Defendant.  (September 26, 2008 Hearing Transcript ("Tr.") at 15-16.) The arrest warrant was issued on April 10, 2008 due to Defendant's failure to report to his parole officer as required by his Conditions of Parole, as well as absconding from his approved residence, a violation of his Conditions of Parole.  (Tr. at 16-17; Gov't Ex. 4.)

2

On April 30, 2008, in preparation for the next day's special operation, Parole Officer Deal reviewed Defendant's parole file on the Division of Parole's "CMS" information database and learned that Defendant (1) had absconded from the Division of Parole as of April 10, 2008, (2) had not had a positive home visit since January 2008, and (3) previously listed 230 West 129th Street, which is part of the St. Nicholas Complex, as his residence to the Division of Parole from 12/4/06 to 12/15/06 and on 3/7/07.  (Tr. at 35, 40, 42, 43, 67; Gov't Ex. 3.)  In addition, Parole Officer Deal testified that the residence address inquiry on the Division of Parole's CMS database showed that Apartment 3C, on the third floor of 230 West 129th Street, was listed as a previous residence for Defendant.  (Tr. at 38-40; Gov't Ex. 5.)  Michelle Daise was listed as a co-occupant.  (Id.)  Parole Officer Deal testified that a parolee's previous addresses are relevant "because usually the parolees, they go back to their old addresses.  And when we do absconder search or we do any kind of special ops and stuff, we go back to the old apartments or their previous apartments and we find most of the guys at their previous addresses."  (Tr. at 67.)  Parole Officer Deal testified that he was not aware of the Special Conditions restricting Defendant from the St. Nicholas Projects.  (Tr. at 21-22.)

In the afternoon of May 1, 2008, Parole Officer Deal, NYPD Lieutenant Cullen, NYPD Detective Wenzel, and several other police officers arrived at 230 West 129th Street, Manhattan (the "Building"), which is part of the St. Nicolas Projects.  (Tr. at 43-44.)  Parole Officer Deal and Lieutenant Cullen proceeded into the building, through the lobby, and up the stairwell to the third floor.  (Tr. at 44.)  Other NYPD officers were positioned in an opposite stairwell, also at the third floor.  (Tr. at 44.)  NYPD officers

3

also monitored the operation from outside of the Building.  (Tr. at 48, 54.)  The officers were in touch on walkie talkies and Nextels.  (Tr. at 48.)

After assuming a position in the stairwell, Parole Officer Deal confronted a male in his 20s, later identified as Rakim Granger, who entered the stairwell after leaving an apartment on the third floor of the Building.  (Tr. at 44-45.)  Granger told Parole Officer Deal that he had just exited Apartment 3C (the "Apartment"), located near the stairwell.  (Tr. at 45.)  Upon questioning Granger in the stairwell, Parole Officer Deal learned that Granger was on parole and searched his person.  (Tr. at 45-46.)  Parole Officer Deal recovered a golf ball size amount of crack cocaine from the pocket of Granger's underwear.  (Tr. at 46.)  Parole Officer Deal asked Granger what he was doing in the Building, and Granger said that he was visiting a friend.  Parole Officer Deal and Detective Wenzel then showed Granger a photograph of Defendant and asked if the individual in the photograph was his friend.  Granger responded, "Nah, I don't really know him like that."  Then they asked Granger if the individual in the photograph was in the Apartment.  (Tr. at 45-46.)  Parole Officer Deal testified that Granger responded, "you know he is."  (Tr. at 47.)  Granger was then taken out of the stairwell by NYPD officers.  (Tr. at 47-48.)

About fifteen or twenty minutes later, Parole Officer Deal, Lieutenant Cullen, and other NYPD officers approached the Apartment door.  Parole Officer Deal orally identified himself as Parole Officer Deal of the Division of Parole, asked to speak to Anthony White, and announced that he had an arrest warrant for Anthony White.  (Tr. at 49-50.)  Lieutenant Cullen also asked Defendant to come out, saying "we knew he was in there, we wanted him to come out, make this easy."  (Tr. at 49.)  Parole Officer Deal

4

testified that Defendant responded with loud cursing from inside the Apartment saying, "Fuck this shit. You all going to get me, you all going to have to fucking kill me. Fuck that. I'm not coming out for this shit." (Tr. at 51.)

Parole Officer Deal and Lieutenant Cullen remained outside of the Apartment door for approximately twenty minutes. (Tr. at 52.) At that time, Lieutenant Cullen removed the removed the peephole of the Apartment's door, and portions of the Apartment's interior could be viewed through the former peephole from the hallway. (Tr. at 51-53.) Through the former peephole, Parole Officer Deal saw the defendant carrying a white bag and walking between the rooms of the apartment. Parole Officer Deal "thought [the bag] was a pillowcase at first. It was just like a white knapsack." (Tr. at 53.) Parole Officer Deal could not see Defendant the entire time he was looking through the peephole, and there were periods he was not looking through it. (Tr. at 54, 99.) At times, Lieutenant Cullen looked through the peephole. (Tr. at 99.)

During the time that Parole Officer Deal and Lieutenant Cullen were outside the Apartment door, the NYPD officers stationed outside of the building were radioing the officers outside of the Apartment door with Lieutenant Cullen and Parole Officer Deal. (Tr. at 54.) Parole Officer Deal testified that he could hear the walkie talkies of the officers in the hallway with him, and the officers outside of the Building were explaining what they were observing over the walkie talkies. (Tr. at 55-56.) Parole Officer Deal testified that he heard "that Mr. White at the time was at the window. It seemed like he was trying to climb or jump out of the window. He had opened the window, and that they thought he was about to jump out the window. You could hear people from the projects telling him to go back in, don't jump, don't jump, go back into the window."

5

(Tr. at 56.) Parole Officer Deal did not recall hearing the officers say that White had anything with him at the window. (Tr. at 57.) At some point during this time, Lieutenant Cullen told Defendant that, if necessary, they would "break the door down," or words to that effect. (Tr. at 89-90.)

Approximately one hour after Parole Officer Deal first announced himself at the Apartment, Defendant opened the door. Parole Officer Deal put his foot in the door, and Defendant exited the Apartment with keys in his hand. (Tr. at 56.) A neighbor entered the hallway, and Defendant told the neighbor to lock the door to the Apartment. (Tr. at 56.) Parole Officer Deal told Defendant that he was going to search the apartment. (Tr. at 56-57.) Defendant asked how could he do that, and Parole Officer Deal responded that he is a parole officer and "this is where you live at. This is the place where you live." Defendant made no response. (Tr. at 56-57.) After the officers handcuffed Defendant, they took him away from the third floor. (Tr. at 57- 58.)

After Defendant was removed from the area, Parole Officer Deal and NYPD officers conducted a protective sweep of the Apartment. (Tr. at 58.) No one else was found inside the Apartment. (Tr. at 58.) After deeming the Apartment safe, Parole Officer Deal, with the assistance of Detective Wenzel and other NYPD personnel, conducted a search of the Apartment. (Tr. at 58-59.) While Parole Office Deal was searching another area of the Apartment, Sergeant Morris noticed a white object inside an entertainment unit in the living room and alerted Parole Officer Deal. (Tr. at 58, 60.) Parole Officer Deal saw the white bag, retrieved it from the entertainment unit, and opened the bag. (Tr. at 60; Gov't Ex. 7.) Inside the bag, Parole Officer Deal found an

object wrapped in a white cloth.  (Tr. at 60, 62.)  He unwrapped the white cloth and discovered a gun.  (Tr. at 60.)

On cross-examination, Parole Officer Deal testified that Michelle Daise gave him consent to search her apartment prior to the search in question, but after the protective sweep.  (Tr. at 81-85.)  He also testified that Daise told him that Defendant lived at the Apartment.  (Tr. at 82.)[2]

### ii. Testimony of Detective David Wenzel

Detective Wenzel has worked for the New York City Police Department for sixteen years.  (Tr. at 124.)  In the afternoon of May 1, 2008, Detective Wenzel was at the St. Nicholas Projects in Manhattan with Parole Officer Deal, Lieutenant Cullen, and other members of the NYPD.  (Tr. at 126.)  Upon arriving at 230 West 129th Street, a building in the St. Nicholas Projects, Detective Wenzel, Lieutenant Cullen, and Officer Deal went up one of the staircases to the third floor and remained in that stairwell for approximately one hour.  (Tr. at 127.)  At one point, Detective Wenzel left the stairwell and went to the stairwell on the opposite side of the building to talk with a couple of other officers.  (Tr. at 127.)  When he returned, a handcuffed individual was in the stairwell with Lieutenant Cullen and Officer Deal, and they told Detective Wenzel that the individual had come out of the Apartment.  (Tr. at 127.)  Parole Officer Deal showed Detective Wenzel drugs that were recovered on the individual.  (Tr. at 128.)  Detective Wenzel then asked the individual whether Anthony White was in the Apartment, but the individual did not respond yes or no.  (Tr. at 128.)

---

[2] Deal's testimony as to Daise's consent is not corroborated by the testimony of Detective Wenzel and is contradicted by the testimony of Michelle Daise.

Detective Wenzel testified that then he, Parole Officer Deal, and Lieutenant Cullen approached the door to the Apartment. (Tr. at 129.) Lieutenant Cullen knocked on the door, identified himself as police, and said they had a warrant for Anthony White and that he should come out. (Tr. at 129.) Detective Wenzel did not recall hearing any response from inside the Apartment at that time. (Tr. at 129.) Approximately five minutes after they approached the door to the Apartment, Detective Wenzel received a call from Sergeant Morris, who was stationed outside of the building in view of the Apartment's window. (Tr. at 130-131.) Sergeant Morris advised that he saw someone at the Apartment's window, and "he was going to throw something out of the window, if we can get down there. He felt like he needed more units." (Tr. at 131.) Detective Wenzel went outside and recognized Defendant standing in the window, periodically coming and going. At one point, Defendant was talking on his cell phone; at another point, he was sitting on the ledge of the window, which lead Detective Wenzel and the other officers to call for emergency services because they thought he was going to jump out of the window. (Tr. at 132.) Detective Wenzel testified that officers outside were telling Defendant to get back inside the window and turn himself in. (Tr. at 133.) According to Detective Wenzel, Defendant responded by saying "You're not coming in here. You can't come in here. You're not coming in here." After remaining outside for approximately five minutes, Detective Wenzel returned to the third floor of the Building. (Tr. at 131-132.) He went back and forth between the exterior of the Building and the hallway outside of the Apartment several times over the course of the fifty or so minutes that the Defendant remained in the Apartment. (Tr. at 133-134.) When he returned at

8

one point, the peephole had been removed from the door and Lieutenant Cullen was talking through it.  (Tr. at 136.)

When Defendant exited the Apartment, Detective Wenzel and others grabbed Defendant and handcuffed him.  (Tr. at 134.)  While the officers were handcuffing Defendant, Detective Wenzel removed the keys to the Apartment from Defendant's hand.  (Tr. at 134.)  Defendant asked Detective Wenzel to shut to the door and lock it for him, but the door remained open and Detective Wenzel kept the keys.  (Tr. at 134.)  Officers then escorted Defendant away.  (Tr. at 134.)

At that time, Detective Wenzel, Lieutenant Cullen, Parole Officer Deal, and others conducted a protective sweep of the Apartment to make sure that no other people were inside; no one else was there.  (Tr. at 134-135.)  Officer Deal then began to search the Apartment.  (Tr. at 135.)  He moved items, looked in boxes, under the bed, etc.  (Tr. at 135.)  Then Sergeant Morris called Parole Officer Deal into the living room and told him that he found a white bag.  (Tr. at 135.)  Parole Officer Deal opened the white mesh bag, and inside was a loaded firarm wrapped in a white piece of cloth.  (Tr. at 135.)  After the search was complete, Daise arrived at the apartment after the Defendant was arrested and the search was complete.  (Tr. at 138.)

### iii.  Testimony of Michelle Daise

Michelle Daise, the tenant of the Apartment, began to see Defendant socially after he was released from prison in March 2007.  (Tr. at 153.)  He came and stayed with her at her Apartment once or twice a week, but Daise testified that Defendant never lived there.  (Tr. at 154.)  Defendant did not have his own set of keys.  (Tr. at 154.)  Daise testified that she did not know where Defendant lived.  (Tr. at 166.)

9

On April 30, 2008 at about 7:00 or 8:00 p.m., Defendant arrived at Daise's Apartment and stayed overnight. (Tr. at 155.) The next morning, she asked him to wait in the Apartment because building maintenance was scheduled to repair her toilet. (Tr. at 155.) Daise gave Defendant a set of keys to the Apartment that morning. (Tr. at 155.) Defendant was sleeping when she left for work at about 8:30 a.m. on May 1st. (Tr. at 156.) Daise left work at approximately 5:00 p.m. and when she got off of the train, she had a message on her cell phone from a police Detective saying that they were in her house and to please come home. (Tr. at 157.) When she returned home, there were about five to seven police officers searching her Apartment. (Tr. at 156, 158.) Daise testified that she never gave the police Detective or the Parole Officer permission to search her Apartment. (Tr. at 160, 164.)

**II.     APPLICABLE LAW**

"It is well-settled that Fourth Amendment protections extend only to unreasonable government intrusion into legitimate expectations of privacy." United States v. Reyes, 283 F. 3d 446, 457 (2d Cir. 2002) (internal citations and quotation marks omitted). In order to determine whether a search is reasonable within the meaning of the Fourth Amendment, courts examine the "totality of the circumstances." United States v. Knights, 534 U.S. 112, 118 (2001). Reasonableness is measured "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interest." Samson v. California, 547 U.S. 843, 848 (2006) (quoting Knights, 534 U.S. at 118-119).

Applying this balancing test in the context of parolees, the Supreme Court has recognized the government's substantial interest in supervising parolees because

10

"parolees…are more likely to commit future criminal offenses." <u>Samson</u>, 547 U.S. at 853 (citing <u>Pennsylvania Bd. of Probation and Parole v. Scott</u>, 524 U.S. 357, 365 (1998) for the proposition that the government's interest in combating recidivism "is the very premise behind the system of close parole supervision"). Moreover, on the "'continuum' of state-imposed punishments…parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." <u>Id.</u> at 850.  Given the government's substantial interest in monitoring parolees, as well as the diminished expectations of privacy held by parolees, parolees' Fourth Amendment protection is limited. See <u>Samson</u>, 547 U.S. at 850-857.

In <u>Samson</u>, the Supreme Court recently upheld a suspicionless search of a parolee under California state law, which requires that parolees agree in writing to be subject to search by parole and police officers at any time of the day or night, with or without a search warrant and with or without cause.[3]  547 U.S. at 846.  Upon examining the totality of the circumstances pertaining to parolees, including the "plain terms of the parole search condition" contained in the California statute, the Court concluded that the parolee "did not have an expectation of privacy that society would recognize as legitimate." <u>Id.</u> at 852.  Furthermore, the Court recognized the substantial interest the state has in combating recidivism and promoting reintegration. <u>Id.</u> at 853-855.  Upon concluding that the suspicionless search of a parolee under California state law is not prohibited by the Fourth Amendment, the Court noted that the decision does not give police officers

---

[3] The relevant California statute provides:
> Any inmate who is eligible for release on parole pursuant to this chapter shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause.

Cal. Penal Code § 3067(a).

11

"unbridled discretion to conduct searches" because California state case law prohibits "arbitrary, capricious or harassing" searches. See id. at 856 (listing California cases).

Courts disagree as to whether or not the relevant parole regulation in New York is similar to the California statue at issue in Samson, and thus there is no consensus on whether or not Samson applies to cases involving New York parolees.[4] Several courts have noted in dicta that New York does not have a statute similar to the California statute at issue in Samson, and they declined to decide whether the parole regulation and waiver signed by parolees in New York are sufficiently similar to the California statute for Samson to apply, instead finding the searches lawful on other grounds. See Alvarado v. City of New York, 482 F. Supp. 2d 332, 336 ("Samson specifically addressed a California parole statute that explicitly allowed for a search without cause by a parole officer. New York does not have an analogous provision.") (internal citation omitted); Gathers v. White, 2007 U.S. Dist. LEXIS 9054, at *9, fn. 4 (E.D.N.Y Feb. 8, 2007) (noting that New York does not have parole-specific statutory search provisions and declining to decide whether the features of "New York's parole landscape mean that New York allows the sort of suspicionless search of parolees that California does"); United States v. Justiniano, 2008 U.S. Dist. LEXIS 27709, *14-*15 (W.D.N.Y. May 29, 2008) (declining to apply Samson standard of suspicionless searches of parolees because "New York has no analogous statute" to the one at issue in Samson). However, opinions by other judges have suggested that the New York parole regulation and waiver are similar

---

[4] Section 8003.2(d) of Title 9 of the New York Codes, Rules and Regulations law establishes the following condition of release:
> A releasee will permit his parole officer to visit him at his residence and/or place of employment and will permit the search and inspection of his person, residence and property.

12

to the California statute in Samson. See United States v. Massey, 461 F.3d 177, 180 (2d Cir. 2006) (Miner, J. concurring) (finding the "waiver" signed by parolees authorizing searches in New York to be, "for all practical purposes, indistinguishable from the 'waiver' apparently signed in Samson in the form prescribed by California law"); United States v. Stuckey, 2006 U.S. Dist. LEXIS 58173, *8 (S.D.N.Y. 2006) (finding that the relevant parole regulation in New York is "[s]imilar to the California statute at issue in Samson" and holding that Samson may be dispositive, and in any case, the search was rationally and reasonably related to the parole officer's duties).

In addition to the open question of whether or not Samson applies to cases involving New York parolees, the scope of Samson's holding is unclear. The suspicionless search at issue in Samson was a search of the parolee's person. At no point in the opinion does the Supreme Court address the issue of whether a suspicionless search of a parolee's residence[5] is permitted by the Fourth Amendment, under the California statute or otherwise.[6]

However, it is not necessary to decide whether or not a suspicionless search is permitted here because the search at issue satisfies the more protective test established by the New York Court of Appeals and upheld by the Second Circuit prior to the Supreme

---

[5] Defendant argues that the Apartment was not his residence and that instead he was an overnight guest. For purposes of Fourth Amendment rights, Defendant's status as a resident or overnight guest is inconsequential. Defendant "fails to recognize that under [Minnesota v. Olson, 495 U.S. 91 (1990) (holding that a houseguest has a legitimate expectation of privacy in his host's home)] his Fourth Amendment rights as a guest are limited to those that he could assert with respect to his own residence." United States v. Taylor, 482 F.3d 315, 318 (5th Cir. 2007). "Olson simply extends to the houseguest the Fourth Amendment rights he would have in his own home." Id.

[6] Several courts have discussed the possibility of Samson's holding extending to the warrantless searches of residences in dicta. See, e.g., Stuckey, 2006 U.S. Dist. LEXIS 58173 at *9-*10 ("While Defendant attempts to distinguish Samson on the ground that his bedroom was searched—rather than his person—neither the holding nor reasoning in Samson suggests that this distinction could sufficiently tip the reasonableness balance, if at all, in his favor."); Massey, 461 F.3d at 180 (2d Cir. 2006) (Miner, J., concurring) (noting that Samson should apply to search of parolee residence at issue).

Court's decision in Samson.  See People v. Huntley, 43 N.Y.2d 175, 181 (1977); United States v. Grimes, 225 F.3d 254, 259 n. 4 (2d Cir. 2000).  In Huntley, the New York Court of Appeals noted that the signed Conditions of Release required by New York parole regulations should not "be taken as an unrestricted consent to any and all searches…" 43 N.Y.2d at 182; see also People v. Hill, 2002 N.Y. Misc. LEXIS 1388, *1 (1st Dep't 2002) (internal citations omitted) ("The standard authorization for home entries and searches by parole officers given by defendant as a condition of his parole does not constitute an unrestricted consent to any and all searches and does not obviate a showing by the parole officers that the search was rationally related to [their] duty to detect and prevent parole violations.")  Instead, the reasonableness inquiry "must turn on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty."  Huntley, 43 N.Y.2d at 181; Grimes, 225 F.3d at 259 n. 4 (holding that Huntley's articulation of a reasonable relationship rule for warrantless parole searches is "coextensive with the requirements of the Fourth Amendment."); see also United States v. Newton, 369 F.3d 659, 665-666 (2d Cir. 2004) (citing Huntley and Grimes for the reasonable relationship rule).  A parole officer has a duty "to investigate whether a parolee is violating the condition of his parole—one of which, of course, is that the parolee commit no further crimes—when the possibility of violation is brought to the officer's attention."  United States v. Reyes, 283 F.3d 446, 459 (2d Cir. 2002) (citations omitted).

### III. DISCUSSION

#### A. Defendant had a diminished expectation of privacy as a parolee

As a Parolee, Defendant had a diminished expectation of privacy in the Apartment. Samson, 547 U.S. at 843. First, parole is conditioned release from prison; it "is an established variation on imprisonment of convicted criminals…The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abides by certain rules during the balance of the sentence." Morrissey v. Brewer, 408 U.S. 471, 477 (1972). Second, that Defendant signed the conditions of release, in which he agreed to searches of his residence, is significant.[7] See Knights, 534 U.S. at 120 (noting that acceptance of clear and unambiguous search condition "significantly diminished Knights's reasonable expectation of privacy"); see also Samson, 547 U.S. at 852 (finding that parolee did not have a legitimate expectation of privacy because he signed and agreed to a parole condition allowing for searches by his parole officer). Furthermore, Defendant signed Special Conditions of Release, which prohibited him from the being in the St. Nicholas Projects, so his presence at the Apartment was wrongful in that it was a violation of his parole.[8] (Gov't Ex. 2.)

---

[7] See footnote 5, supra.

[8] Indeed, Defendant's wrongful presence at the Apartment presents an alternative basis on which his motion to suppress could be denied. An individual has a legitimate expectation of privacy only where (1) he has a subjective expectation of privacy in the place searched, and (2) that subjective expectation of privacy is one that society has deemed reasonable. Smith v. Maryland, 442 U.S. 735, 740 (1979). The Supreme Court noted in Rakas v. Illinois that "'wrongful' presence at the scene of a search would not enable a defendant to object to the legality of the search." 439 U.S. 128, 141 n.9 (1978); see also United States v. Roy, 734 F.2d 108, 110-11 (2d Cir. 1984) (holding that an escaped felon, as no more than a "trespasser on society," could not have a legitimate expectation of privacy in the passenger compartment or trunk of his car).

### B. Parole Officer Deal's search of the Apartment was rationally and reasonably related to his duties as a New York State Parole Officer

Parole Officer Deal's search of the Apartment, conducted along with NYPD police officers,[9] was rationally and reasonably related to his duties as a New York State Parole Officer, and therefore the search was reasonable. An arrest warrant had been issued for Defendant for violating the conditions of his parole. (Gov't Ex. 4.) Defendant had absconded from the Division of Parole and had not had a positive home visit since January 2008. (Tr. at 42.) In fact, Defendant's presence at the Apartment was in itself a separate violation of his parole, as he had Special Conditions that prohibited him from the St. Nicholas Projects.[10] After arriving at the Building, Parole Officer Deal encountered another parolee who had just exited the Apartment and possessed crack cocaine. (Tr. at 44-46.) When the parolee was shown and picture of Defendant and asked whether Defendant was in the Apartment, the parolee responded "you know he is." (Tr. at 47.) Finally, after Parole Officer Deal and NYPD announced themselves and their possession of the arrest warrant for Anthony White, Defendant said, among other things, "I'm not coming out," and he refused to surrender himself for approximately one hour. During that hour, Defendant leaned out of the window and NYPD officers reported that he may

---

[9] That police officers accompanied Parole Officer Deal during the search does not make this reasonable search unreasonable. See Newton, 369 F.3d at 662 (holding that police assistance during an otherwise reasonable warrantless search by parole officers does not make the search unreasonable). In United States v. Reyes, the court noted that "it is difficult to imagine a situation where a probation officer conducting a home visit in conjunction with law enforcement officers, based on a tip that the probation officer has no reason to believe conveys intentionally false information about a supervisee's illegal activities, would not be pursuing legitimate supervised release objectives." 283 F.3d 446, 463 (2d Cir. 2002). See also Gathers, 2007 U.S. Dist. LEXIS 9054 at *12.

[10] Whether or not Parole Officer Deal had knowledge of the Defendant's Special Conditions at the time of the search is not dispositive because courts are "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." United States v. Knights, 534 U.S. 112, 122 (2001) (citations omitted); see also Cass v. County of Suffolk, 2005 U.S. Dist. LEXIS 8623, *13 (E.D.N.Y. May 11, 2005) ("Regardless of the subjective intent of the officers involved, as long as their conduct was based on a valid condition of probation [or parole], the Fourth Amendment is not implicated.")

16

throw something out of the window. (Tr. at 55-56, 131, 133.) Detective Wenzel recognized Defendant in the window of the Apartment. (Tr. at 132, 137.) According to Parole Officer Deal, Defendant was shouting at the officers and told them that they could not enter the Apartment. (Tr. at 51, 131-133.) This testimony suggested that Defendant was concerned about officers entering the Apartment, possibly because he possessed something that he did not want the officers to see.[11]

These facts demonstrate that the search was rationally and reasonably related to Parole Officer Deal's duties of detecting and preventing parole violations and investigating whether a parolee is violating the conditions of his parole. See Newton, 369 F.3d at 666.

### C. Parole Officer Deal's search of the Apartment was in accordance with the Purpose and Policy of the Division of Parole Policies and Procedures Manual

Defendant relies on the New York State Division of Parole Policy and Procedures Manual (the "Manual") to argue that Parole Officer Deal did not have grounds to search the Apartment. This court need not consider the New York State Division of Parole's internal Manual in deciding whether the search violated the Fourth Amendment. Indeed, "the appropriate inquiry for a federal court considering a motion to suppress evidence seized by state police officers is whether the arrest, search, or seizure violated the Fourth Amendment…because the exclusionary rule is only concerned with deterring Constitutional violations." United States v. Chirino, 483 F.3d 141, 149-50 (2d Cir. 2007)

---

[11] Defendant argues that any observations made through the removed peephole cannot be considered because any item viewed would not come within the "plain view" doctrine. See Horton v. California, 496 U.S. 128, 136 (1990) (noting that the item seized without a warrant must be plainly viewed by officers from a lawful place). It is unnecessary to address this issue here because the conclusion that Parole Officer Deal's search was rationally and reasonably related to his duties as a parole officer does not rely on his observations of Defendant with a white bag or on any other observations made through the removed peephole.

(citations omitted) (considering a probation search).  However, even considering the relevant portions of the Manual, the search was conducted in accordance with the stated purpose and policy of the Manual, which are as follows:

> Purpose: To provide general guidelines for Parole Officers to search a releasee's person, residence, and other premises under the releasee's control…
>
> Policy: A Parole Officer has the authority to conduct a warrantless search of a releasee, a releasee's residence, and other premises under the releasee's control…when there is an articulable reason to conduct the search that demonstrates a risk to public safety or the releasee's reintegration into the community…

New York State Division of Parole Policy and Procedures Manual, Item 9405.04, p. 1 (April 2002).

> The pertinent procedure provisions of the Manual are as follows:
>
> D. Search of Premises:
>
>> 1.  Releasee: An Officer may search, or direct the search of *premises under a releasee's control* including shelters, residence programs, single room occupancies and similar dwellings, when there is an articulable reason for the search and when the search is rationally and reasonably related to the performance of the Officer's duties.  Prior to conducting such a search, in the absence of *exigent circumstances* or consent, the Parole Officer must confer with a supervisor and obtain supervisory approval for such search.
>>
>> 2. Third Party:  Absent a search warrant, an Officer may not search any other premises, including those of third party, which are not under a releasee's control without the consent of the person in possession, ownership, or control of the premises.
>
> (emphasis in original).
>
> "Premises under a releasee's control" is defined as:
>
>> Any place, building or part thereof capable of being owned and/or controlled by a person which reasonably appears to be under a releasee's ownership or control.
>
> "Articulable reason" is defined as:

> A reason based upon information which appears to be reliable and which results from; knowledge of specific facts by a parole officer, observations by said officer, communication from the releasee…or from another government agency.

New York State Division of Parole Policy and Procedures Manual, Item 9405.04, pp. 1-3 (April 2002).

Under these procedures, the provision governing the search of a third party's premises only applies when the premises are not under a releasee's control. In this case, the Apartment was clearly under the control of the Defendant on May 1, 2008. The Defendant was in possession of the keys to the Apartment, and he was the sole occupant of the Apartment in the middle of a Thursday afternoon. (Tr. at 56, 134.)

Moreover, Parole Officer Deal had an "articulable reason" to conduct the search. In fact, he had several articulable reasons. As discussed supra, Parole Officer Deal encountered another parolee who had exited the Apartment with a golf ball size amount of crack cocaine in his pocket. (Tr. at 45-46.) After being informed that the officers had warrant for his arrest, Defendant yelled, "I'm not coming out." Defendant then refused to exit the Apartment for almost one hour, during which time he yelled that officers could not enter the Apartment, which suggested that Defendant had something to hide. (Tr. at 51, 131-133.) It is true that the Manual's procedure requires that prior to conducting a search of the premises under a releasee's control, and absent exigent circumstances or consent, the Parole Officer needs permission from a supervising officer. Parole Officer Deal did not obtain a supervisor's permission. However, this does not affect the legality of the search under the Constitution, and in fact, given the articulable reasons that Parole Officer Deal had prior to conducting the search, the search was reasonable and in accordance with the stated purpose and overall policy of the Manual.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress is denied.


IT IS SO ORDERED.


Dated: New York, New York
December 16, 2008

_____
Robert P. Patterson, Jr.
U.S.D.J.


Copies of this Opinion and Order faxed to:

Lev L. Dassin, Acting U.S. Attorney
Southern District of New York
ATTN: Zachary Feingold, A.U.S.A.
One St. Andrew's Plaza
New York, NY 10007
Tel:    212-637-2436
Fax:   212-637-2937

Leonard F. Joy, Esq.
Federal Defenders of New York
Attn:   Philip L. Weinstein, Esq.
52 Duane Street – 10th Fl.
New York, NY 10007
Tel:    212-417-8700
Fax:   212-571-0392